Mr. Feinberg? Yes, Your Honor. Good morning, and may it please the Court. Jonathan Feinberg on behalf of the appellant Omar Bennett. I respectfully request three minutes for rebuttal. Yes, sir. This is a unique case in that all parties, including this Court, are in agreement on one of the essential components of Mr. Bennett's claim that his trial counsel provided ineffective assistance. This Court, on direct appeal, said that trial counsel abandoned his client's interests for purposes of direct appeal when he failed to submit a proper Andrews brief. And more fundamentally, for purposes of this Section 2255 petition, the District Court found, at least implicitly, the government conceded, and the government certainly has expressly conceded on appeal, that trial counsel failed to advise Mr. Bennett on two absolutely essential points that were necessary to Mr. Bennett evaluating whether he wanted to proceed by way of a plea or proceed to trial. And those two points are addressed at length in the brief. I think it's worth repeating. They affected sentencing at both ends. Can we actually find from the record that there is a reasonable probability that Bennett would have taken an open plea if he had the correct information beforehand? Most certainly you can. How is that? That I find difficult, given the uncle's testimony and given the inexactitude of this particular point. Mr. Bennett says, I knew about the 20-year mandatory minimum before trial began because I looked at the statute in the library and looked up, I guess it was 841b1a, I think he said, right? Correct. Which doesn't provide for a 20-year mandatory minimum. Well, it does with one prior conviction. Right, right, right, right. But that's not on the table. It's not on the table when jury selection begins. The 841 is filed the day before trial begins. The one assistant files it. Lorette doesn't know about it. Briskin doesn't know about it. As far as we can tell, in the plea negotiations that occur at the inception of trial, there's no discussion of it at that point. It appears from this record that the only time it's brought up is Mr. Bennett's mention during his testimony that he knew about from his work in the library, and then the discussion actually at sentencing where it seems like everyone in the courtroom is under a misapprehension that it applies. Obviously, that later on when it's determined that conviction doesn't satisfy, it's not a final judgment. Everybody knows it doesn't apply. That's right. In light of Mr. Bennett's position. But at the point of the discussion of the open plea, we know about the open plea now because the letter, the Lorette letter that Mr. Bennett remembered. Correct. The 20-year mandatory minimum isn't on the table. Well, it certainly was on the table. Who knows about it and who should have known about it? I think, well, I'll tell you from my personal experience in representing criminal defendants in federal court. Oh, boy. We don't have that much time. I know you don't have that. I certainly don't intend to tell war stories. But I think the important practice point is that every criminal defendant who goes into a trial, every criminal defense attorney who prepares for trial has to tell a client, look, if you proceed to trial, the government's going to file this 851 information before we go to trial. We don't know that. Lorette's the lead counsel and he didn't file it. He doesn't know that his partner has filed it. So why should I, let's say I, for the moment, am the criminal defense lawyer. Why would I be required to tell Mr. Bennett before trial, yes, they're going to file it. But in point of fact, it's not on the table. It's not part of the discussion. So how can that be ineffective? That's what I'm not getting. I would actually disagree vehemently with that point, Judge. And the reason is that when a defense attorney has to look, absolutely has to look at what the possible sentencing exposure can be. So a defense attorney in this case, as soon as he sees Mr. Bennett indicted, as soon as the case gets indicted, your natural inclination should be as a defense attorney, and I think this court would agree, certainly in light of United States v. Booth, where the court says comparative sentence exposure is the key fact for the defendant to understand. A defense attorney has to look, absolutely has to look at what the possible sentencing exposure can be. So a defense attorney in this case, as soon as he sees Mr. Bennett indicted, as soon as he looks at Mr. Bennett's prior record, has to absolutely be thinking this defendant possibly faces a 20-year mandatory minimum. I'm always Bennett looking at going into trial. You know, he's in the courtroom and just about ready to pick a jury. What was he looking at in terms of exposure, his exposure at that time, based on his understanding? I think at this point, everyone's in agreement that after the 851 is filed, he knows for certain that he's looking at a 20-year mandatory minimum, plus the three to six year term that he's already serving in state, in state court. Exactly. That's right, because he's not proper. He's not advised at all by his defense attorney as to whether that point he is aware of a 20-year minimum mandatory. Exactly. I'm sorry, what day are we talking about? Well, I think I think Judge Fuentes asked me about the first day of trial. Correct. And I would submit to the court that Mr. At that point on that day, is he interested in an open plea? Well, at that point, he is not interested in an open plea because his expectation is, and this is an expectation that if we look back in time, he had all the way from the beginning when he wasn't getting any advice from his trial counsel. His expectation is no matter what he does, no matter what he does, he's going to get 20 years plus three to six. And in fact, so I'm trying to get to the prejudice prong here. So the prejudice occurred a little bit before that. Well, in fact, here, I think, is the critical point when it comes to prejudice and to just circle back and finish with Judge Greenaway's question. Absolutely. I think that this court's prior holdings, I would point to Booth. We could go the whole range of cases concerning ineffective assistance in the sentencing context that a defense attorney has an absolute obligation. It's aside from telling you what you're charged with. The second obligation has to be here's what you're looking at in terms of a sentence. But here's what I don't understand. If Lorette hasn't, if when Lorette is negotiating with Briskin on the first day of trial, the 851 isn't on the table. Well, no, it was, he didn't know. We all know it's filed. That's right. And that's not surprising because what, and Ms. Stark walked in the room. She probably will back me up on this. My understanding of what happens at that time is that Ms. Stark and Mr. Lorette are in the middle of seven trials because this indictment has indicted 39 separate defendants. I may be off on the numbers. But in any event, for one of them to file the 851 and one of them not to have it in his mind that, oh, Bennett has a prior conviction, he's looking at a 20-year mandatory minimum. He's not unreasonable under the circumstances. Really, what the conclusion should be, we don't need to focus, I would submit to the court, on what the government knew or didn't know. What we need to focus on is what defense counsel should have known, what the exposure could have been. And that actually brings me to Judge Fuentes' point, which is what Mr. Bennett knows, whether it's the first day of trial or six months before trial, is because my trial lawyer is telling me nothing different, I'm getting 20 years if I go to trial. I'm getting 20 years if I enter a plea. I would point the court specifically to his testimony. You said before it would be 20 years consecutive to the state. Exactly, and I'm using 20 years as a shorthand in that explanation. I'd point the court to page 81 of the appendix. Why is that the conclusion because of the open plea? Because when Mr. Bennett expects that he's going to get the mandatory, and then once the 851 is filed, that's confirmed. But he has to go in with that expectation, I would submit, based on what a defense attorney has to tell the client. If he goes in with that expectation, no matter what he does, he pleads open, he's not going to get the acceptance of responsibility reduction because the mandatory is on the table, and in fact, trial counsel misunderstood that basic principle of criminal law. Trial counsel told Judge Dalzell that he thought that, yeah, acceptance of responsibility can reduce the sentence below a 20-year mandatory. That's fundamentally incorrect. What Mr. Bennett said in his testimony at the hearing, which is undisputed by anyone, at page 81 of the appendix in response to the question, did you believe that you were left with two options? Go to trial and face a 20-year mandatory or plead and face a 20-year mandatory? Answer, that's all there was. What he knows, whether it's the first day of trial, whether it's December of 2003 where they have this conference with Judge Dalzell, where they're trying to work out some of their differences because of lack of communication, he thinks that's what he's getting. There's no choice. Any defendant presented with these options, plead get 20, trial get 20, of course they're going to go to trial. So when Judge Dalzell relies in his findings of fact on statements that were allegedly made to an uncle sometime before Mr. Bennett went to trial, and of course, we didn't have that witness in court, didn't have an opportunity to examine him, and Judge Dalzell read from that transcript actually before anyone argued, those statements to the uncle are made at a time when Mr. Bennett believes, because his trial lawyer hasn't told him anything different, that he's getting 20 no matter what he does. So when he says, according to the uncle, prove it, what he's saying, you have to look at the context, what he's saying is, well look, if I get 20 one way or the other, I may as well roll the dice. Let him prove it. That's not, as Judge Dalzell found, swagger or some intention to put the government to its proof. That's a reasonable choice. Why in that light? He was looking at 20 mandatory, minimum mandatory. Right. He was also looking at a consecutive sentence. No credit for taking responsibility. Correct. Why should we conclude that he would have taken an open plea? Because we know that as he gets close to trial, when his trial lawyers told him nothing different about what the principles of law are, which are going to govern his sentence, and the time he serves, he says, he throws it out there. It's a first offer. Give me 10 years. See if you can get me 10 years, we'll save the government some time. That's really the nature of the conversation. So it's not as if he, we're operating in a vacuum here, where Bennett has never said to anyone, hey, I want to plead guilty. Could he have gotten mandatory 20? Well, mandatory is off the table now. What benefit would he have gotten with an open plea? With an open plea, he would have gotten, and we provided these charts in front of the district court, and they're attached at the appendix. With an open plea, given what we know now that the mandatory doesn't apply, had he been advised early on, he would have gotten a three-point reduction for acceptance of responsibility. Why would he have gotten the third point? The judge said he wouldn't have given it to him. It's within the judge's discretion to give him the third point. That's what the government argues. We have to assume, we have to assume that if a trial lawyer was acting in an objectively reasonable fashion, as I've said, I think as firm as I can say it, that's the first conversation that the defense attorney has to be having. ABA standards say that. This court's prior decisions say that. The first conversation that defense counsel has to have with Mr. Bennett is, this is the benefit you could get by pleading guilty in these circumstances. That conversation should have happened in December of 2003. If it happens in December of 2003, Mr. Bennett knows. He enters the plea based on what we learn later from his intentions. And at that point, it's well before trial. The government hasn't proven it. And I've never seen a case in this district, the Eastern District of Pennsylvania, where the U.S. Attorney's Office has a plea in hand months before trial and doesn't move for the third point. It would have been granted in these circumstances. Mr. Bennett would have gotten that reduction. His guideline range would have been 168 to 210. When you compare that to his understanding of what a 10-year plea was, his understanding of 10 years is 10 plus the 3 to 6 that he's then serving because he doesn't know any better. He thinks it has to be consecutive. When you add the 10 that he proposes to the 3 to 6 that he's serving, it's in the range that's just 5 to 6 months less than what he could have gotten with an open plea. Mr. Feinberg, we'll get you back on the line. Thank you, Your Honor. Mr. McKeon. Good morning, Your Honors. May it please the Court. Bernadette McKeon for the government. I'd like to start by answering Judge Fuente's first question, which was, can this Court on this record find that there was a reasonable probability that Mr. Bennett would have entered an open guilty plea? And our response to that question is a firm no. The government is not arguing about the ineffectiveness prong of the Strickland test. The government concedes that counsel did not provide accurate advice, both about the mandatory minimum and the potential mandatory minimum, and also about the state sentence credit for doing so. The concession in your brief is that he should have informed him of the potential. The potential, correct. Okay. That's correct, Your Honor, because as Your Honor correctly noted, the 851 notice was not filed until April 14th at the first day of jury selection. Mr. Bennett admits that that is the first, that that's when he learned that it was filed. He also admits, and this is significant, not only- I thought he admitted that he learned it in the library way before that. He did- not only did he admit that he researched the recidivist enhancement, but he said he understood the significance of an 851 notice based on his own research, and that once that notice was filed in his own words, he was stuck with a 20-year sentence. That notice was not filed until April 14th. That's on page 68 of the record. Those are his words. But that notice was not filed until April 14th. Prior to that time, there is not one shred of evidence that Mr. Bennett ever said to anyone, to his uncle, to his counsel, the reason I'm not willing to consider a guilty plea is because of the 20-year mandatory. Note what he was telling them, and as his counsel said on pages 41, 51, 53, and 40 of the appendix, he wanted to fight the charges. He told me he was innocent. But he did- he did make an offer to plead. He did, and I- It's contained in Mr. Lawrence's letter. He- he made an offer to plead on- on the- on April 14th, jury selection. Isn't- isn't that indicative of what he wanted to plead? Your Honor, that might mean that he was willing to plead guilty on his terms to a sentence that he believed, in his mind, was half of the mandatory sentence that he faced. The government, both the government and his own counsel, said this was not a serious offer. This was a non-starter. Mr. Bennett had been told repeatedly that his only- the only way the government would entertain a plea deal with him was if he cooperated. He chose not to, as is his right. But for him to then say on the evening trial, well, I'll take 10 years, thinking that he faced 20 years. Mr. Loret's letter, remember, does not mention the 20 years because, as- as Judge Greenaway pointed out, he wasn't aware that the 851 notice had been filed. Instead, he focused on the extremely high guideline range that he faced, starting at a base level of 38, and that's when he suggested an open plea. Mr. Bennett was aware of the possibility of an open plea based on that, even though in his affidavit that he submitted to the court, and this was a credibility finding the judge made, he claimed, I was never told about an open plea. You're familiar with Turner v. State of Tennessee? I can't say I am, Your Honor. Well, in that case, it's a- it's a- has to be a Supreme Court case. No, it's a Sixth Circuit case. Sixth Circuit case, which determined that the- a sworn statement from a defendant, um, that he would have taken a plea, uh, together with the defendant's sworn testimony, is sufficient to establish prejudice. Well, Your Honor, I disagree with that proposition because the judge has the obligation. The judge who conducted this hearing, the district court, made credibility findings. He found that his testimony was not credible, and there were a number of inconsistencies, um, that the court noted, one major inconsistency, there are another- other inconsistencies, and also things that don't gel together in his testimony. And this court, the judge's credibility findings are supported by the record, they are in- not based on- on internally inconsistent testimony. Are the judge's findings in conflict with the defendant's own statement that I would have taken a plea, even though it was- I understand it was not acceptable to the prosecution, but I will take a 10-year sentence- But Your Honor, if I could- okay, I'll go back to that point, and then I'll come back. The- the important thing about the offer to plead guilty to 10 years, to enter a plea- a plea if he received a 10-year sentence, is that that has absolutely- there's no suggestion that that means he would take an open plea to an indeterminate sentence, where his guideline range started at- with the two levels, 188 to 235 months. This was a man who clearly wanted a deal. I think the problem that the defense is pointing out is not too many people would take an open plea when you're facing a 20-year minimum mandatory as a consecutive sentence to a state term. That- no, that's correct, Your Honor, but my point is the fact that he offered to plead guilty to 10 years does not in any way suggest that he was willing to enter an open guilty plea. Let's take that 20 years off the table, and- and- and had he been correctly advised, that's what we're considering. Had he been correctly advised, and he knew that he didn't face the 20-year mandatory minimum because the sentence- the judgment wasn't final, would he have entered an open plea? And does that offer to plead guilty to 10 years suggest that? Our- our response is absolutely not. There were so many contingencies, it's like a pile of speculations that would have to occur, of speculative events. There were- first of all, he would have had to serve the minimum of his state sentence. He would have had to receive a three-level reduction for timely acceptance of responsibility. He would have had to receive full amount of good time credit, and the court would have had to impose the bottom of the guideline range to get him down to that 10-year range that the defense contends is- it was comparable to his plea deal, if he had been correctly advised that he did not face the mandatory. So I don't think you can look at his offer to plead guilty to a flat 10 years, a guaranteed sentence, and say that he would be willing to gamble, um, and- and face potentially a much higher sentence and enter a plea at that point. And that goes back to the point that at no point prior to this time had he ever said to anyone, I want to plead guilty. He- he admitted twice in his testimony that he- he first raised that on April 14th. Eve of trial jitters, perhaps, but he didn't make a serious offer. You don't disagree that at- at the time when- about the start of trial that, uh, Bennett was facing a 20-year sentence? Everyone believes he was, Your Honor. Everyone- and everyone believed that that sentence would be imposed consecutive to- I don't know about- I don't think that's correct, Your Honor. I think that, um, the guidelines make it clear that it- that if that sentence were related conduct and part of the offense conduct, I'm not sure exactly- well, yes, you're correct, Your Honor. We did take that position at sentencing. I'm sorry, in hindsight. The 10-year offer by Mr. Bennett, um, as related by- to Mr. Lorette by Mr. Briskin, that occurred before, uh, Mr. Lorette and Mr. Briskin knew that the 851 had been filed. Is that right? I think what happened is the 851- yes, I think Mr. Lorette didn't know. Clearly, his letter dated April 15th, which is the next day, doesn't reference a 20-year mandatory. It references the significant and substantial drug quantities and guideline range he faced. So he was not aware of that. And at the time- now, what we have, I don't think Mr.- I think Mr. Briskin did testify that he became aware of the 851 notice on that day. Let me- let me ask you a question. So, um, he's facing- forget about the 851 for a moment. He's facing, um, um, level 38, uh, and so, uh, his max is in the 300s, I think, somewhere. Way up there. Um, and what Lorette mentions before everybody focuses on the 851 is, uh, you know, we have the possibility of an open plea, but this is what you're looking at. If you just came in and pled, you'd be looking at, uh, you know, 268 to whatever, somewhere around there. Then the- then the, um, the, um, 851 comes in. What's the difference in- in sentence, uh, between the 20-year mandatory minimum and what he would've got- what- what he would be facing just looking at a level 38? It's- it's de minimis, right? At a level 38, it- it- it was very insignificant. The- the level 38 without any credit for acceptance or responsibility was 235 to 293, I believe. So, we had a 240-month, um, mandatory sentence in there. Well, with a two-level reduction absent the 240 months, it was one, uh, um, 168 to 235. Yeah, yes. So, there was not a significant difference. But I think what's really important here is that there's just no support for Mr. Bennett's claim that he was willing to plead guilty, to enter an open guilty plea at any time prior to this date. And on that date, his plea offer was so inadequate that even his own counsel said, I- I couldn't even bring that to the- to the- the government. And I knew it was a non-starter, as did Mr. Lorette. So, we cannot place too much- we can't really rely on that offer as evidence that he was willing to plead guilty, an open guilty plea to an indeterminate sentence. It's very- it's very hard, uh, to reconstruct what didn't happen, but we- we do know that he was facing a- a dreadful situation, right? In other words, what he was told that he was facing, that is 20 years, which was wrong, and a consecutive sentence to a state sentence, which was also wrong. I don't know whether he was told that. That was his understanding. He said his defense attorney never- never discussed it with him. I didn't think that there was any- any dispute about it. So, in his own mind, he was assuming that it would be consecutive. I don't know what- we don't know what he was- When- when do we know that everyone knew, wrongly, but knew that there was a 20-year mandatory minimum? I thought the first day that we knew that was at sentencing. Now, obviously, once everybody's aware of the 851, but we don't- No, I think it was- We don't know when everybody's aware of the 851 prior to the date of sentence, because on the- on the first day of trial, when the Lorette letter's going back and forth in their plea negotiations, there's no evidence in the record that either Lorette or Briskin know about the 851. So, we can't assume that they know about that then, correct? On- on that first day, that's correct, Your Honor. I believe that's correct. I would have to look- I don't- Mr. Briskin said he did learn about the 851 when it was filed on April 14th, but when- that was filed, I believe, towards the end of the day. I don't know whether he learned it at that time, but their conversation, what Mr. Lorette said and Mr. Briskin said, it was a very brief conversation. It was, is there anything we can work out? You know, jury's not sworn yet. And Mr. Lorette- Mr. Briskin could remember mentioned 10 years, and Mr. Lorette said, I think it was- it was something that was so low, the number that was presented, it was a non-starter. If it was 10 years, that was completely out of the question. So, that was the extent of the conversation. Mr. Lorette then testified that he went home that night, thought about it, and said, really, his only option would be an open plea. So, Mr. Lorette clearly didn't know about the 851 notice when he wrote that letter. Whether counsel, by the time he received the letter the next day, was aware of the 851 notice, I believe his testimony was that he learned about it that day. So, he would have known about it that day. I can understand the government's position that 10 years was just not, not in the cards at all, but that doesn't mean that he was not willing to plead. I mean, he- But Your Honor, nothing up until that point in time had suggested he was willing to plead. Well, he was willing to take a 10-year sentence. No, but not only that, there was no indication that that was his hang-up about pleading guilty, because he told his uncle, he told his counsel repeatedly, I want to fight these charges. I want the government to prove it. I'm innocent. And so, at this last minute, this happens. Defendants have a change of heart at the last minute, but there's nothing to suggest that that was even the driving force behind his, other than his own testimony, which the judge, the district court judge, who not only sat through this hearing, but was very familiar with Mr. Bennett after a trial and two sentencing hearings, decided was incredible. So, I guess we're supposed to believe that Mr. Bennett learned at some point prior to trial that he was subject to a 20-year mandatory minimum and kept it to himself, that in his discussions with his counsel, he never said, hey, man, why aren't we talking about this 20-year mandatory minimum, because there's no evidence in the record that that discussion happened. I, I, I, I, I, I, my understanding is that Mr. Bennett said that he did raise it with counsel, and counsel said, I, I'm, I'm not, I don't know about that. So, he, he testified that he raised it with counsel. Counsel's recollection, counsel's testimony was, I don't recall. He may have, I just don't recall. So, there may have been a discussion about that, but my point is, Mr. Bennett admitted, he said, that he never raised, he never said to counsel, let's explore a guilty plea until the evening trial. And if that was the reason, and the 851 hadn't been filed, he should have, I, I, it just defies common sense that he wouldn't have said that. I mean, in the Day case, for example, that's, that's a situation where the defendant told his counsel, I'm not pleading guilty to, to, to five years, because my maximum is 11 years. Well, he was wrong, and he got 22 years. But the point is there, that is what he said to counsel, he, he was saying, I'm not taking it because of this. We have no evidence that Mr. Bennett ever, ever suggested that that was the reason he wasn't pleading guilty until this hearing after the fact, or perhaps on April 14th. Did he testify before Judge DelZell that he was incorrectly informed about the consequences of, of, of taking a plea that is the 20 years? Oh yeah, Your Honor, we're not disputing that. So, that's all in the record. That's all in the record. But I would note that there were a number of things that, that were. But you're, you're saying that the, the testimony contradicts what actually happened that, at the, on the day of trial. I'm saying that his, the, the district court, Judge DelZell found that his testimony was not credible, that he would have accepted an open plea on that date. And that, that finding, which is largely based on his credibility determination, is supported by the record. I would note, like, for example, he repeatedly testified on the stand that he was not, he did not raise the issue of an open plea earlier in the process because of the recidivist enhancement. And yet, he also, when, when pressed on cross examination about, well, did you ever, did, did you say to counsel that you wanted to fight the charges and you were innocent? He, at first, was a little evasive, and then he said, well, yeah, but that was, that was before I knew everything about my case. But later in his testimony, he, he says, I never learned anything about my case. I was never provided any discovery. And that's at pages 92 and 84. So, he was contradicting himself. Should we adopt the, I guess it's the dicta in day and make it a holding with regard to reasonable probability? I'm not sure what you're. Well, you mentioned day a few moments ago, right? And day, I thought, talked about objective evidence, whether or not there's objective evidence, and talked about applying a reasonable probability test. Is it reasonably probable that the defendant would have? Oh, that's absolutely the test. And not only day has recognized that, but the Supreme Court has recognized that. It's whether or not there was a reasonable probability that had he been correctly informed about the mandatory minimum and the consecutive sentence, he would have entered an open guilty plea. And the judge, Judge Delzell, found that he would not. And that is a credibility determination that is consistent. It's supported by the record. It's not clearly erroneous and should not be disturbed by this court. In order to grant the relief requested by the, oh, can I make this one point? In order to grant the relief requested by the defense, this court would have to find that, would have to credit Mr. Bennett's testimony in the face of a district court ruling that he wasn't credible. And that's simply not what this court should do as the appellate court, not the trier of fact. Thank you. Thank you, Mr. Piccinini. Mr. Feinberg. Thank you. Is it correct that we'd have to find that Judge Delzell's actual findings were clearly erroneous? And if that is the correct test, tell us why we should find them clearly erroneous. I agree completely that that's the standard. As the court has made clear, the case I cite in the brief is Igbonwa, clearly erroneous is not necessarily this insurmountable standard. If there are internal inconsistencies in the court's ruling, then you have it. And you have a classic internal inconsistency here where Judge Delzell says he wasn't going to plead guilty, but on the other hand, we know he didn't get the right advice. Under Day and Booth, this court has made clear that a defense attorney has an absolute obligation to provide a defendant with knowledge as to the comparative sentencing exposure. To say that a defendant was never going to plead guilty when that defendant never got the right advice in the first place simply does not make sense. That's the inconsistency which undermines the trial court's findings. The position that the government advocates here, I would suggest, completely redefines the role of a defense attorney. The suggestion that it was appropriate for trial counsel to listen to Mr. Bennett spout on and on about how he wanted to go to trial and how he wanted to make the government prove its case without responding, hey, this is what you're looking at here, that's a fundamental problem. I give the example in the brief of a defense attorney in a homicide case, not advising the defendant that, look, you're looking at a life sentence. Take that one more level. If it's a capital case and the defendant is saying, I'm innocent, I didn't do it, take me to trial, and the defense attorney never says, oh, you know, you could get the death sentence, that's a problem. Now, that's an extreme example, but it's the same fundamental facts we have here, where a defense attorney is, under his description, acting like nothing more than a blank slate, a sounding to his client saying, take me to trial, without talking about what the comparative sentencing exposure is. But here's what I don't understand. So on the first day of trial, after the 851 is filed, after the Lorette letter is filed, at that point, I presume we can say that both Mr. Bennett and Mr. Briskin know that, based on their current understanding, incorrect though it may be, that he was looking at a 20-year mandatory minimum. That is correct. And I also think that the record supports it. I don't think the government disputes this, that Mr. Bennett had to expect that there was going to be an 851 filed. Although, to tell you the truth, what I'm hearing today is that the government is saying that he didn't necessarily have to expect that, which is not an ironic argument, because on the one hand, the government is saying, Mr. Bennett has all these great expectations about how he's going to get good time credit reduced at his minimum, and we can't trust those optimistic expectations. But on the other hand, you never know. The 851 may not be filed. Here's my point. I understand your point, which is Briskin was obligated to have told him this at the very beginning, so that throughout the entire process, he should have known, incorrectly at the time, that he was exposed to a 20-year mandatory minimum. However, there is a point in time, right, when both Briskin and Bennett know that Bennett is subject to a 20-year mandatory minimum. So from that point in time, there is a dynamic which will allow Bennett to, under an incorrect set of circumstances, I understand, weigh whether it makes sense to plead at that time. Well, and I would disagree, actually, because I think it has to be that he's going to be facing the mandatory sentence leading up to trial, and that's, I think that's where the government and I depart, and I would suggest the way this court has defined a defense attorney's roles in advising of sentencing exposure, Mr. Bennett should have known from his trial lawyer that that's what he was looking at. So it's not as if, I see, I think I understand what Your Honor is suggesting, that there was a period of months before then when Mr. Bennett could have expected, okay, well, maybe I can take an open plea now and not worry about the mandatory I don't think that that actually would have happened, and I don't think we can attribute to Mr. Bennett that expectation, because he should have been aware that he was likely looking at a 20-year mandatory. Ultimately, if I may make one final point, I see I'm out of time. The key question is this, when did Mr. Bennett want to get out of jail? The offer of 10 years, under his expectation, he would get out of jail between October of 2012 and October of 2015. Under the open plea, with a correct understanding of the law, he would have gotten out of jail between March of 2013 and April of 2016. A range, but the floor and the ceiling are five to six months apart. What he expected and hoped for is exactly what he would have gotten if he got the appropriate advice, and for that reason, I asked the court to remand for a resentencing, as if Mr. Bennett would have entered an open plea. Thank you, Mr. Feinberg. Thank you. Mr. McKeown, thank you very much. Both very good arguments. We'll take the case under advisement.